UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ANGELA BURRELL o/b/o
DESHANTAY E. DAVIS,

                    Plaintiff,

          -against-

MICHAEL J. ASTRUE,[1] Commissioner
of Social Security,

                   Defendant.
--------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

04 Civ. 9551 (RMB) (GAY)

TO THE HONORABLE RICHARD M. BERMAN, United States District Judge:

      Plaintiff Angela Burrell commenced this *pro se* action on behalf of her minor

grandchild, Deshantay Davis, pursuant to 42 U.S.C. § 405(g).  Plaintiff challenges the

decision by the Commissioner of Social Security ("the Commissioner") to discontinue

Deshantay's disability insurance benefits based upon a finding that she was no longer

disabled.  The Commissioner has moved for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c).  For the reasons that follow, I respectfully recommend that the

Commissioner's motion should be granted.

---

    [1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J.
Astrue, the current Commissioner of Social Security, has been substituted as the
defendant in this action.

## I. BACKGROUND

### A. Procedural History

Deshantay Davis was born 1/31/2000 (42).[2]  On or about March 10, 2000, plaintiff filed an application for disability benefits on behalf of Deshantay (92-95).  The agency determined that Deshantay was disabled as of the date of her birth due to malnutrition, marasmus and failure to thrive, and her SSI benefits commenced on that date (42).  Upon review of Deshantay's case, the agency determined that her health had improved and concluded that she was no long disabled as of August 20, 2002  (43-47).  Consequently, her SSI benefits ceased on 10/01/02 (44).  On or about November 8, 2002, plaintiff requested reconsideration on the ground that Deshantay was still disabled due to asthma and anemia (47-48).  On March 7, 2003, following a disability hearing, the hearing officer determined that Deshantay was no longer disabled as of August 20, 2002 (63-73).  On March 15, 2004, pursuant to plaintiff's request, a hearing was held before an administrative law judge ("ALJ") (27-41).  On June 28, 2004, the ALJ issued a written decision in which he concluded that Deshantay's disability had ceased as of August 20, 2002 (14-26).  Said decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 3, 2004.  This action followed.

### B. The Hearing Before the ALJ

Plaintiff Angela Burrell, her daughter Jennifer Davis and claimant Deshantay Davis were present at the March 15, 2004 hearing before the ALJ (29).  Deshantay was

---

[2] Numbers in parentheses refer to pages from the administrative transcript, filed with defendant's motion in accordance with 42 U.S.C. § 405(g).

four years old at the time of the hearing (30).

### 1. *Angela Burrell's testimony*

Angela Burrell is claimant's grandmother (32).  Deshantay had been living with Ms. Burrell since 2000 (32).  Deshantay goes to an asthma clinic in the Bronx for treatment (32).  The treatment is administered via a mask, which Deshantay tries to use herself, but her mother and grandmother won't let her because Deshantay might give herself too much medication (33).  Deshantay was born premature with chronic lung disease (33-34).  She failed to thrive at first but, at the time of the hearing, that was no longer a problem (33).  Deshantay had not been admitted to a hospital for the last year or so (34).

### 2. *Jennifer Davis's testimony*

Ms. Davis is claimant's mother (29).  The doctor determined that Deshantay's asthma was worse in the winter and normal in the summer (35).  So, in the winter, the doctors prescribed a stronger Flovent pump for her.  Ms. Davis and Deshantay live with Ms. Burrell (36).  Ms. Davis stated that her biggest worry about Deshantay is that she gets out of breath when she runs (36-37).  Deshantay was overweight at the time of the hearing and was on a diet per the doctors' recommendation (37).  When Deshantay's SSI benefits ceased in February or March of 2003, her Medicaid benefits also stopped (38).  Ms. Davis could not afford the self-pay for doctors, so she took Deshantay to the emergency room two or three times (38).  Ms. Davis believed Deshantay was entitled to SSI because Ms. Davis believed that Deshantay could not work later in life if her asthma continued (38).  Deshantay was learning her ABC's and could count (39).

C. <u>Medical Evidence in the Record</u>

      1. *Medical evidence upon which claimant was found to be disabled*

Deshantay was born at Bronx Lebanon Hospital at twenty-seven weeks gestation and weighed two pounds, one ounce (186, 189, 233).  She remained in the hospital for almost three months until she was discharged on April 25, 2000 (186).  At the time of her discharge, Deshantay was diagnosed with extreme status post chronic lung disease (186).

On May 10, 2000, Deshantay was examined at the Bronx Lebanon outpatient clinic (187).  She weighed seven pounds, six ounces and was twenty and one-half inches long (187).

On June 20, 2000, Deshantay was examined by pediatric consultant Dr. Robert DeVita (189-91).  Deshantay, who was then five months old, weighed eleven pounds, five ounces which placed her in the 15th percentile (190).  She was eighteen inches long, which was far below the 5th percentile (190).  Dr. DeVita noted claimant's "severe head lag" and her "slightly floppy" appearance (190).  He stated that Deshantay did not respond to her name and did not sit with support (190).  Dr. DeVita's impression was that Deshantay's developmental level was two months (190).  He concluded that Deshantay's ability to perform age-appropriate activities and to behave in an age-appropriate manner were moderately affected, and her prognosis was fair (190-91).

On July 10, 2000, based upon a review of Deshantay's medical record, state agency physician S. Imam concluded that plaintiff met the requirements of section 100.02 of the listing of impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (193-96).

2.   *Medical evidence since the Comparison Point Determination date*[3]

From January 21 through January 23, 2001, Deshantay was treated at Bronx Lebanon Hospital Center for right lower lobe pneumonia and reactive airway disease (197).  This was reportedly claimant's first episode of wheezing (208, 211).  She was treated with antibiotics, inhalers and nebulizer treatments (211-213).  When Deshantay was discharged on January 23rd, she had no wheezing or retraction and was not in respiratory distress (199).

On February 9, 2001, Deshantay was treated at Bronx Lebanon Hospital's Pediatric Asthma Center (215-219).  She was diagnosed with mild to moderate persistent asthma, for which Flovent and Albuterol were prescribed (219).

In April 2001, the New York City Early Intervention Program ("NYCEIP") prepared an Individualized Family Service Plan ("IFSP") for Deshantay's mother, Jennifer Davis (224-31). Ms. Davis reported that Deshantay was in "good health" (222).  Deshantay, who was fourteen months old, could crawl with her head up and was walking, but falling frequently (222).  She could sit without support but her balance and coordination were weak (222).  She walked on her toes when bare footed and could bend down consistently (222).  Deshantay's muscles "seem[ed] a little bit tight" (222).  She could take off her clothes and diaper when soiled or wet (222).  She could drink from a straw and sippy cup, and slept through the night (222).

---

[3] The Comparison Point Determination (or Decision) date ("CPD") is the date of the SSA's "most recent favorable decision" that claimant was disabled or continued to be disabled. The most recent favorable decision is the "latest final determination or decision involving a consideration of the medical evidence and whether you were disabled or continued to be disabled."  20 C.F.R. § 416.994a(c)(1).

5

Deshantay's communication, cognitive and social/emotional skills were evaluated as follows (223): she spoke six or seven words; she tried to repeat and imitate new words; she would point and gesture to relate her needs; no oral-motor problems reported; Deshantay liked riding a bicycle; she had some concept of cause-and-effect (e.g. she would look for hidden toys, and if she threw a toy she realized it would "bang"); Deshantay was friendly, smiled and played with other children; she would cry if she didn't get her way; she had age-appropriate temper tantrums and range of emotions.

The goals of the IFSP were to improve Deshantay's vocabulary, motor skills, balance and coordination (224). Said goals were to be achieved via a home-based physical therapy program and with the use of toys, games, therapeutic techniques, equipment, repetition and modeling (224).

On April 9, 2002, Deshantay was examined by consultative examiner Dr. Emma Florez (233-35). Deshantay's mother, Ms. Davis, related Deshantay's history of asthma and anemia and stated that Deshantay's first asthma episode occurred in January 2001 (233). Ms. Davis reported that Deshantay had been seen in the hospital emergency room twice during the last year and had been admitted to the hospital for one week in January 2001 (233). Her last asthmatic episode was in March 2002 (233). She is treated with Albuterol via Aero Chamber, and Flovent (233). In January 2002, Deshantay was found to have low hemoglobin and was given iron (233).

Dr. Florez examined Deshantay and noted that she was well-developed, well-nourished and in no acute distress (234). She weighed thirty-three pounds (25th percentile) and was thirty-five inches tall (50th percentile) (234). All major systems (chest, cardiovascular, abdomen, genitalia, extremities, skin and back) were normal

6

(234-35).  Deshantay had normal deep tendon reflexes and good muscle tone and her cranial nerves were intact (235).  Dr. Florez noted that Deshantay's daily activities included walking up and down steps holding the rail, speaking three-word sentences, self-feeding and running (235).  Dr. Florez concluded that Deshantay's gross motor, language, personal/social and fine motor development were normal for her age (235). Dr. Florez stated that Deshantay's "[d]evelopment and activities have not been affected by the impairment.  Eating, feeding, dressing, playing and home activities are at full range" (235).  Dr. Florez noted that Deshantay had not been admitted to the hospital during the past year and that her asthmatic episodes could be controlled at home with a bronchodilator (235).  Dr. Florez also stated that Deshantay's anemia "should improve with the present treatment" (235).

Dr. M. Malik, a state agency physician, performed a childhood disability evaluation on Deshantay on August 20, 2002 (237-43).  Based upon the evaluation, Dr. Malik indicated that Deshantay's condition had shown significant medical improvement and noted that she was no longer receiving physical and occupational therapy (238, 243).  Dr. Malik also stated that the severity of Deshantay's impairments did not currently meet or equal the requirements of the listing impairment (237).  Deshantay's lungs were clear and her weight was in the twenty-fifth percentile (243).  Dr. Malik assessed Deshantay's functional ability, and found no evidence of limitation in the areas of (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating to others and (4) caring for yourself (240-41).  On the other hand, Dr. Malik considered Deshantay's history of asthma and found that she had a less than marked limitation in the areas of (1) moving about and manipulating objects and (2)

7

health and physical well-being (241).

On November 27, 2002, when Deshantay was thirty-four months old, she was examined by consultative examiner Dr. Tomasito Virey (244-47).  Dr. Virey noted that Deshantay had not been treated for asthma at the emergency room in the last six months, although she had occasionally received treatment from her primary care physician or was treated at home (244).  Dr. Virey examined Deshantay and found her to be well-developed but significantly obese for her height and age (244).  She was forty inches tall and weighed forty-six pounds, which was above the ninety-fifth percentile for both height and weight (246).  Dr. Virey reported that Deshantay's speech and language appeared to be normal for her age, as was her mental status and affect (245).  Dr. Virey concluded that Deshantay's ability to perform age-appropriate activities and behave in an age-appropriate manner was, at the time of the examination, "mildly to moderately affected" (247).

## II.  STANDARD OF REVIEW

The Commissioner's factual findings are conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation and citation omitted).  "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quotation and citation

8

omitted).  The reviewing court "may only set aside a determination which is based upon legal error or not supported by substantial evidence." Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998) (quotation and citation omitted).

## III.  STANDARD FOR DETERMINING CHILD'S ELIGIBILITY FOR SSI BENEFITS

In order for a child under the age of eighteen to be found disabled and eligible for SSI benefits, he must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . . [However,] no individual under the age of 18 who engages in substantial gainful activity . . . may be considered to be disabled." See 42 U.S.C. § 1382c (a)(3)(C)(i)-(ii); Encarnacion v. Astrue, 568 F.3d 72, 75 (2d Cir.2009).  The Commissioner's implementing regulations delineate a three-step process for determining whether a child is disabled and eligible for benefits.  See 20 C.F.R. § 416.924(a).  First, the ALJ must determine whether the child is engaged in "substantial gainful activity."  See 20 C.F.R. § 416.924(b).  If the child engages in substantial gainful activity, there can be no finding of disability.  See 20 C.F.R. § 416.924(a)-(b).  If not, the ALJ proceeds to step two and determines whether the child has a severe impairment or combination of impairments .  See 20 C.F.R. § 416.924(c).  If the impairment(s) constitute a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," the child will not be found to have a severe impairment.  See 20 C.F.R. § 416.924(c); see also, Encarnacion, 568 F.3d at 75.  If there is a finding of severe impairment, however, the ALJ proceeds to step three and

9

determines whether the impairment(s) meet, medically equal, or functionally equal an impairment listed in an appendix to the regulations. <u>See</u> 20 C.F.R. § 416.924(d); 20 C.F.R. pt. 404, subpt. P, app. 1 (listing and describing impairments deemed to result in marked and severe functional limitations).

A claimant's impairment medically equals a listed impairment if the claimant's impairment is at least equal in severity and duration to one described in the listing. <u>See</u> 20 C.F.R. § 416.926(a). A claimant's impairment functionally equals a listed impairment if the claimant exhibits "marked" limitation in two of six functional domains described in the regulations, or "extreme" limitation in one of the domains. <u>See</u> 20 C.F.R. § 416.926a(a). The six functional domains are: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well being." <u>See</u> 20 C.F.R. § 416.926a(b)(1). A claimant has a "marked" limitation if the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." <u>See</u> 20 C.F.R. § 416.926a(e)(2)(I). An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." <u>See</u> 20 C.F.R. § 416.926a (e)(3)(I).

## IV. STANDARD FOR TERMINATION OF DISABILITY BENEFITS

Once a child is found to be disabled, their continued eligibility for benefits is periodically reviewed. <u>See</u> 20 C.F.R. § 416.994a(a). A child's benefits may be discontinued if there is a finding, supported by substantial evidence, that there has been

10

medical improvement in the child's impairment and that such impairment no longer results in marked and severe functional limitations.  See 42 U.S.C. § 1382c(a)(4)(B)(i). The Commissioner's implementing regulations prescribe a three-step sequential evaluation to determine whether the child's disability continues.  See 20 C.F.R. § 416.994a(b).  First, the Commissioner will determine if there has been any "medical improvement" in the child's condition.  See 20 C.F.R. § 416.994a(b)(1).  Medical improvement is defined as "any decrease in the medical severity of [the child's] impairment(s) which was present at the time of the most recent favorable decision that [the child] w[as] disabled or continued to be disabled. . . . based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the child's] impairment(s)."  20 C.F.R. § 416.994a(c).  If there has been no medical improvement, the child continues to be disabled (unless exceptions not here applicable apply).  See 20 C.F.R. § 416.994a(b)(1).  Second, if there has been medical improvement, the Commissioner considers "whether the impairment(s) that [the Commissioner] considered at the time of [the Commissioner's] most recent favorable determination or decision still meets or equals the severity of the listed impairment it met or equaled at that time."  See 20 C.F.R. § 416.994a(b)(2).  If the impairment does, the child's disability will be found to continue.  See id.  If the impairment does not, then the Commissioner proceeds to the third step and determines whether the child is currently disabled pursuant to steps two and three of the rules for determining eligibility in initial disability claims for children.  See 20 C.F.R. § 416.994a(b)(3); 20 C.F.R. § 416.924(c); 20 C.F.R. § 416.924(d).

**V.  THE ALJ'S DECISION**

On June 28, 2004, after hearing testimony and considering the medical evidence, the ALJ issued a written decision finding Deshantay no longer disabled as of August 20, 2002 (14-26).  The ALJ followed the three-step sequential evaluation set forth in 20 C.F.R. § 416.994a (18).  At step one, the ALJ found that there had been medical improvement in Deshantay's impairment since the CPD of January 31, 2000 (20).  At step two, the ALJ found that Deshantay's impairment no longer satisfied the requirements in listing 100.02 (20).[4]  At step three, the ALJ considered whether Deshantay was currently disabled (20).  The ALJ found that Deshantay had asthma and anemia, but neither of these impairments met, medically equaled, or functionally equaled an impairment listed in an appendix to the regulations (20-25).

**VI.  REVIEW OF THE ALJ'S FINDINGS**

A. <u>Medical Improvement</u>

At step one, the ALJ found that there had been medical improvement in Deshantay's impairment since the CPD of January 31, 2000 (20).

Since the CPD, Deshantay was hospitalized from January 21 through January 23, 2001 for right lower lobe pneumonia and reactive airway disease (197).  This was reportedly claimant's first episode of wheezing (208, 211).  She was treated with antibiotics, inhalers and nebulizer treatments (211-213).  When Deshantay was discharged on January 23rd, she had no wheezing or retraction and was not in

---

[4] The ALJ noted that, at the CPD, Deshantay's condition met listing 100.02 based upon her low birth weight.

respiratory distress (199).

On February 9, 2001, Deshantay was evaluated at the Pediatric Asthma Center (215-219).  An examination of her lungs revealed normal percussion, vesicular breathing, absence of rales, absence of wheezing and normal expiratory phase (218).  She was diagnosed with mild to moderate persistent asthma, for which Flovent and Albuterol were prescribed (219).

In April 2001, the NYCEIP interviewed Deshantay's mother, Jennifer Davis (224-31).  Ms. Davis reported that Deshantay was in "good health" (222).  Deshantay, who was fourteen months old, could crawl with her head up and was walking, but falling frequently (222).  She could sit without support but her balance and coordination were weak (222).  She walked on her toes when bare footed and could bend down consistently (222).  Deshantay's muscles "seem[ed] a little bit tight" (222).  She could take off her clothes and diaper when soiled or wet (222).  She could drink from a straw and sippy cup, and slept through the night (222).  Deshantay talked using six or seven words, played with her toys and was friendly and interacted with other children (223).

On April 9, 2002, Deshantay was examined by consultative examiner Dr. Emma Florez (233-35).  Deshantay's mother, Ms. Davis, related Deshantay's history of asthma and anemia and stated that Deshantay's first asthma episode occurred in January 2001 (233).  Ms. Davis reported that Deshantay had been seen in the hospital emergency room twice during the last year and had been admitted to the hospital for one week in January 2001 (233).  Her last asthmatic episode was in March 2002 (233).  She is treated with Albuterol via Aero Chamber, and Flovent (233).  In January 2002, Deshantay was found to have low hemoglobin and was given iron (233).

13

Dr. Florez examined Deshantay and noted that she was well-developed, well-nourished and in no acute distress (234).  She weighed thirty-three pounds (25th percentile) and was thirty-five inches tall (50th percentile) (234).  All major systems (chest, cardiovascular, abdomen, genitalia, extremities, skin and back) were normal (234-35).  Deshantay had normal deep tendon reflexes and good muscle tone and her cranial nerves were intact (235).  Dr. Florez concluded that Deshantay's gross motor, language, personal/social and fine motor development were normal for her age (235).  Dr. Florez stated that Deshantay's "[d]evelopment and activities have not been affected by the impairment.  Eating, feeding, dressing, playing and home activities are at full range" (235).  Dr. Florez noted that Deshantay had not been admitted to the hospital during the past year and that her asthmatic episodes could be controlled at home with a bronchodilator (235).  Dr. Florez also stated that Deshantay's anemia "should improve with the present treatment" (235).

Dr. M. Malik, a state agency physician, performed a childhood disability evaluation on Deshantay on August 20, 2002 (237-43).  Based upon the evaluation, Dr. Malik indicated that Deshantay's condition had shown significant medical improvement and noted that she was no longer receiving physical and occupational therapy (238, 243).  Deshantay's lungs were clear and her weight was in the twenty-fifth percentile (243).

On November 27, 2002, when Deshantay was thirty-four months old, she was examined by consultative examiner Dr. Tomasito Virey (244-47).  Dr. Virey noted that Deshantay had not been treated for asthma at the emergency room in the last six months, although she had occasionally received treatment from her primary care

14

physician or was treated at home (244).  Dr. Virey examined Deshantay and found her

to be well-developed but significantly obese for her height and age (244).  She was forty

inches tall and weighed forty-six pounds, which was above the ninety-fifth percentile for

both height and weight (246).  Dr. Virey examined Deshantay's chest and lungs, and

reported equal expansion and excursion bilaterally, with no retractions, normal air entry,

and no wheezing or rales (246).  Dr. Virey reported that Deshantay's speech and

language appear to be normal for her age, as was her mental status and affect (245).

Dr. Virey concluded that Deshantay's ability to perform age-appropriate activities and

behave in an age-appropriate manner was, at the time of the examination, "mildly to

moderately affected" (247).

        In sum, based upon the above record evidence, Deshantay's condition had

significantly and steadily improved.  Accordingly, substantial evidence supports the

ALJ's finding of medical improvement in Deshantay's condition since the CPD.

        B.  Claimant No Longer Meets Listing 100.02

        At step two, the ALJ found that Deshantay's impairment no longer satisfied the

requirements in listing 100.02 (20).  At the CPD, according to the SSA, Deshantay's

condition met listing 100.02 based upon her low birth weight.  Section 100.02 requires

a:

> *Growth Impairment*, considered to be related to an additional specific
> medically determinable impairment, and one of the following:
> A.  Fall of greater than 15 percentiles in height which is sustained; or
> B.  Fall to, or persistence of, height below the third percentile.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 100.02.

        Dr. Florez examined Deshantay In April 2002, when Deshantay was twenty-six

months old.  Dr. Florez found Deshantay to be a well-developed, well-nourished child (234).  She weighed thirty-three pounds (25th percentile) and was thirty-five inches tall (50th percentile) (234).  Dr. Virey examined Deshantay on November 27, 2002, when Deshantay was thirty-four months old.  Dr. Virey found Deshantay to be well-developed but significantly obese for her height and age (244).  She was forty inches tall and weighed forty-six pounds, which was above the ninety-fifth percentile for both height and weight (246).  Accordingly, considering Dr. Florez's and Dr. Virey's findings, substantial evidence supports the ALJ's finding that Deshantay's impairment no longer satisfied the requirements in listing 100.02.

C.  Evaluation of Current Disability

The third step in the sequential evaluation is to determine whether the child is currently disabled pursuant to steps two and three of the rules for determining eligibility in initial disability claims for children.  See 20 C.F.R. § 416.994a(b)(3); 20 C.F.R. § 416.924(c); 20 C.F.R. § 416.924(d).  Here, in accordance with the regulations, the ALJ first determined that Deshantay had a severe impairment or combination of impairments, i.e., asthma and anemia (20).  See 20 C.F.R. § 416.924(c).  The ALJ then addressed the final issue and determined that Deshantay's impairments did not meet, medically equal, or functionally equal an impairment listed in an appendix to the regulations (20-25).  See 20 C.F.R. § 416.924(d); 20 C.F.R. pt. 404, subpt. P, app. 1.  Thus, the ALJ concluded that Deshantay was no longer disabled as of August 20, 2002 (26).

1.  *Meets or medically equals a listed impairment*

The ALJ evaluated Deshantay's impairments under section 100.03 (asthma) and

16

107.03 (anemia) and concluded that Deshantay's impairments did not meet or medically equal a listed impairment.  This conclusion is supported by substantial evidence.

Section 103.03, the asthma listing, specifically includes a requirement for continuing signs and symptoms despite a regimen of prescribed treatment and requires that a claimant have suffered either (1) at least six asthma attacks requiring physician intervention within a twelve-month period, 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, § 103.03B, or (2) a persistent low-grade wheezing requiring treatment with steroids for more than five days, three times a year, 20 C.F.R., Part 404, Subpart P, Appendix 1, Part B, § 103.03C(2).  Here, based upon Dr. Florez's assessment, the ALJ properly found that Deshantay's asthma was controlled at home with a bronchodilator and had not required physician intervention during the past year (21, 233, 235).  Thus, Deshantay's medical record does not indicate that the frequency of her asthma attacks satisfy the criteria of Section 100.03B.  Nor is there medical evidence in the record which indicates that Deshantay suffered persistent low-grade wheezing requiring steroidal treatment.  To the contrary, her first (and last reported) episode of wheezing occurred in January, 2001.  Subsequent examinations on February 9, 2001, April 9, 2002 and November 27, 2002 revealed that her lungs were clear, with no wheezing or rales (218, 234, 246).  Thus, based upon the medical record, Deshantay's impairment also fails to satisfy the criteria of Section 100.03C.  Accordingly, substantial evidence supports the ALJ's conclusion that Deshantay's impairment does not meet or medically equal the criteria of Section 103.03.

Section 107.03, the anemia listing, requires:

> *Hemolytic anemia (due to any cause).*  Manifested by persistence of
> hematocrit of 26 percent or less despite prescribed therapy, and
> reticulocyte count of 4 percent or greater.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 107.03.  Here, in April 2002, Dr. Florez

reported that Deshantay's anemia "should improve with the present treatment" (235).

On August 20, 2002, Deshantay was examined by Dr. Malik, a state agency physician,

who concluded that Deshantay's impairments did not meet or medically equal the

requirements of a listed impairment (237-43).  Accordingly, substantial evidence

supports the ALJ's conclusion that Deshantay's impairment does not meet or medically

equal the criteria of Section 107.03.

2.  *Functionally equals a listed impairment*

The ALJ also considered whether Deshantay's impairments were functionally

equal to the requirements of a listed impairment.  In accordance with the regulations,

the ALJ specifically identified each of the six domains of functioning, analyzed the

record evidence relevant to each domain and concluded that Deshantay did not have

marked limitations in two domains or an extreme limitation in one domain.  Specifically,

the ALJ concluded that Deshantay had less than marked limitations in the domains of

(1) moving about and manipulating objects and (2) health and physical well-being.  The

ALJ found no limitations as to the other four domains.  The Court will consider each

domain in turn:

Acquiring and Using Information.  Dr. Florez reported that Deshantay's speech

and language were normal, and her development and activities were not affected by her

impairments (235).  Dr. Malik assessed Deshantay's functional ability, and found no

evidence of limitation in the area of acquiring and using information (240).  Dr. Virey

reported that Deshantay's speech and language appeared to be normal for her age, as was her mental status and affect (245).  Accordingly, substantial evidence supports the ALJ's conclusion that Deshantay had no limitation in the domain of acquiring and using information.

Attending and Completing Tasks.   This domain refers to how well a child is able to focus and maintain attention, and how well she begins, carries through and finishes activities.  See 20 C.F.R. § 416.926a(h).  Dr. Florez stated that Deshantay's "[d]evelopment and activities have not been affected by the impairment.  Eating, feeding, dressing, playing and home activities are at full range" (235).  Dr. Malik assessed Deshantay's functional ability, and found no evidence of limitation in the area of attending and completing tasks (240).  Dr. Virey noted that Deshantay enjoyed watching television, playing, listening to music and being read to (245).  Additionally, plaintiff's grandmother indicated that Deshantay had no difficulty playing by herself or with others (174).  Accordingly, substantial evidence supports the ALJ's conclusion that Deshantay had no limitation in the domain of attending and completing tasks.

Interacting and Relating to Others.   In April 2001, a report from the NYCEIP indicated that Deshantay was friendly, smiled, played with other children and had age-appropriate temper tantrums and range of emotions (223).
In April 2002, Dr. Florez concluded that Deshantay's personal/social skills were normal for her age (235).  In August 2002, Dr. Malik assessed Deshantay's functional ability, and found no evidence of limitation in the area of interacting and relating to others (240).  Dr. Virey reported that Deshantay's speech and language appeared to be normal for her age, as was her mental status and affect (245).  Accordingly, substantial

19

evidence supports the ALJ's conclusion that Deshantay had no limitation in the domain of interacting and relating to others.

Moving About and Manipulating Objects.  The NYCEIP report noted that Deshantay, at fourteen months old, could crawl with her head up and was walking, but falling frequently (222).  She could sit without support but her balance and coordination were weak (222).  She walked on her toes when bare footed and could bend down consistently (222).  Deshantay's muscles "seem[ed] a little bit tight" (222).  She could take off her clothes and diaper when soiled or wet, and could drink from a straw and sippy cup (222).   One year later, Dr. Florez reported that Deshantay had normal deep tendon reflexes and good muscle tone (235).  Dr. Florez noted that Deshantay's daily activities included walking up and down steps holding the rail, and running (235).  Dr. Florez concluded that Deshantay's gross motor and fine motor development were normal for her age (235).  Dr. Florez stated that Deshantay's "[d]evelopment and activities have not been affected by the impairment.  Eating, feeding, dressing, playing and home activities are at full range" (235).  Four months later, in August 2002, Dr. Malik found that Deshantay, in light of her history of asthma, had a less than marked limitation in the area of moving about and manipulating objects (241).  Accordingly, substantial evidence supports the ALJ's conclusion that Deshantay had a less than marked limitation in the domain of moving about and manipulating objects.

Caring for Yourself.  In this domain, the ALJ considers how well the claimant maintains a healthy emotional and physical state, including: how well she gets her physical and emotional wants and needs met in appropriate ways;  how she copes with stress and changes in her environment; and whether she takes care of her own health,

possessions, and living area.  See 20 C.F.R. § 416.926a(k).  For preschool children

(age 3 to attainment of age 6), caring for yourself means wanting to take care of many

of their physical needs by themselves (e.g., putting on shoes, getting a snack), and also

wanting to try doing some things that they cannot do fully (e.g., tying shoes, climbing on

a chair to reach something up high, taking a bath).  See 20 C.F.R. § 416.926a(k)(2)(iii).

In April 2001, the NYCEIP report noted that Deshantay (at fourteen months old) could

take off her clothes and diaper when soiled or wet, drink from a straw and sippy cup,

and slept through the night (222).  Deshantay had some concept of cause-and-effect,

would point and gesture to relate her needs, would cry if she didn't get her way and had

age-appropriate temper tantrums and range of emotions (223).  In April 2002, Dr. Florez

noted that Deshantay's daily activities included self-feeding (235).  Dr. Florez concluded

that Deshantay's personal development was normal for her age (235).  Dr. Florez stated

that Deshantay's "[d]evelopment and activities have not been affected by the

impairment.  Eating, feeding, dressing, playing and home activities are at full range"

(235).  In August 2002, Dr. Malik found no evidence of limitation in Deshantay's ability to

care for herself (241).  Additionally, Angela Burrell testified at the hearing that

Deshantay tries to administer her asthma treatment herself, but her mother and

grandmother won't let her because Deshantay might give herself too much medication

(33).  Accordingly, substantial evidence supports the ALJ's conclusion that Deshantay

had no limitation in the domain of caring for yourself.

Health and Physical Well-Being.  In this domain, the ALJ considers the

cumulative physical effects of physical or mental impairments and their associated

treatments or therapies on the claimant's functioning that were not considered in the

21

domain of "moving about and manipulating objects." See 20 C.F.R. § 416.926a(l).

In April 2001, during the NYCEIP interview, Ms. Davis reported that Deshantay was in

"good health" (222).  In April 2002, Dr. Florez stated that Deshantay's "[d]evelopment

and activities have not been affected by the impairment " (235).  Dr. Florez noted that

Deshantay had not been admitted to the hospital during the past year and that her

asthmatic episodes could be controlled at home with a bronchodilator (235).  In August

2002, Dr. Malik examined Deshantay's lungs and found them to be clear (243),

Nonetheless, Dr. Malik considered Deshantay's history of asthma and found that she

had a less than marked limitation in the area of (2) health and physical well-being (241).

On November 27, 2002, Dr. Virey noted that Deshantay had not been treated for

asthma at the emergency room in the last six months, although she had occasionally

received treatment from her primary care physician or was treated at home (244).  Dr.

Virey examined Deshantay's chest and lungs, and reported equal expansion and

excursion bilaterally, with no retractions, normal air entry, and no wheezing or rales

(246).  Dr. Virey concluded that Deshantay's ability to perform age-appropriate activities

and behave in an age-appropriate manner was, at the time of the examination, "mildly to

moderately affected" (247).  Accordingly, substantial evidence supports the ALJ's

conclusion that Deshantay had a less than marked limitation in the domain of health and

physical well-being.


## VII.  CONCLUSION

       For the reasons set forth above, I conclude that substantial evidence supports

the Commissioner's determination that Deshantay was no longer disabled as of August

20, 2002.  Accordingly, I respectfully recommend that defendant's motion for judgment on the pleadings should be granted.

## VIII.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(c), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from receipt of this Report to serve and file written objections to this Report and Recommendation.  If copies of this Report are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of this Report to file and serve written objections.  See Fed. R. Civ. P. 6(d).  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Richard M. Berman, United States District Court, Southern District of New York, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned at 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to the Honorable Richard M. Berman and not to the undersigned.

Dated:   January _____, 2011
         White Plains, New York

Respectfully Submitted:

_____
GEORGE A. YANTHIS, U.S.M.J.

23